06-80307

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA CIV-MIDDLEBROOKS
(MIAMI DIVISION)

CASE NO.

MAGISTRATE
JOHNSON

DAVID FENNELL,

    Plaintiff,

vs.

ROYAL PALM CAPITAL GROUP,
INC., a Florida corporation and BERRY –
SHINO SECURITIES, INC., an
Arizona Corporation,

    Defendants.
_____/

## COMPLAINT

Plaintiff David Fennell hereby sues Defendants Royal Palm Capital Group ("Royal Palm") and Berry – Shino Securities Inc. ("Berry – Shino") and alleges as follows:

1. Plaintiff Fennell is a resident of Scottsdale, Arizona and is *sui juris*.

2. Defendant Royal Palm is a Florida corporation with its principal place of business in West Palm Beach, Florida. Royal Palm is a lead equity sponsor for leveraged buyouts and other private and public control investments.

3. Defendant Berry – Shino Securities is an Arizona corporation with its principal place of business in Scottsdale, Arizona. Berry – Shino is an investment banker and an investment adviser.

4. This Court has personal jurisdiction over Royal Palm because it is a resident of this State.



5. This Court has personal jurisdiction over Berry – Shino because it engaged in tortious acts within this State, giving rise to the claims stated herein.

6. Venue is proper in this Court as Royal Palm's principal place of business is within this jurisdiction and because the tortious acts giving rise to this claim emanated from this jurisdiction. 28 U.S.C. § 1391.

7. This Court has subject matter jurisdiction over this matter because the claims stated herein present federal questions. 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over this matter. 28 U.S.C. § 1367(a).

8. This case arises out of Berry – Shino's solicitation of Fennell in connection with a $275,000.00 investment and the ultimate execution by Royal Palm in Fennell's favor of a promissory note in the same amount. The promissory note is now in default.

9. On or about January 27, 2005, at Berry – Shino's solicitation, Fennell invested in a debt securities instrument of SSI – PM Holdings, Inc., parent company of Sunshine Industries, Inc. Berry – Shino solicited this investment through a private placement and provided Fennell an offering memorandum and a subscription agreement.

10. The private placement contained a representation that the offering had a minimum of $500,000.00. Notwithstanding this representation, Berry – Shino unilaterally modified this minimum by reducing it to $275,000.00, presumably to ensure that Fennell's money could be obtained regardless of whether Berry – Shino was able to raise any additional funds.

11. On or about July 20, 2005, Berry – Shino recommended that Fennel accept a $275,000.00 promissory note from Royal Palm in place of his investment in SSI-PM

representing that Royal Palm was a superior investment. Berry – Shino did not provide Fennell with an offering memorandum or a subscription agreement in connection with the investment in Royal Palm.

12. The Royal Palm promissory note, attached hereto as Exhibit A, contained a maturity date of February 23, 2006. Royal Palm did not pay Fennell when the promissory note came due and has not paid Fennell as of the filing of this Complaint. Accordingly, the promissory note is in default and Fennell has previously declared it to be so.

13. Fennell has fulfilled all conditions precedent to the bringing of this action or such conditions precedent have been waived.

14. Because of the Defendants' actions, Fennell has been required to retain the undersigned counsel to prosecute this action and has agreed to pay the undersigned counsel a reasonable fee for its services.

## COUNT I
## BREACH OF PROMISSORY NOTE

15. This Count of the complaint is brought against Royal Palm and states a claim for breach of the Royal Palm promissory note.

16. In support of this Count of the complaint, Fennell repeats and realleges Paragraphs 1 through 14 as if fully set forth herein.

17. On February 24, 2006, Royal Palm defaulted on the Royal promissory note by failing to make the payments which became due and owing on February 23, 2006 in the amount of $275,000.00.

18. Fennell is entitled to be paid on the promissory note and Royal Palm's failure to pay Fennell constitutes a breach of the promissory note. Fennell has suffered damages as a result of Royal Palm's breach of the promissory note.

**WHEREFORE**, Fennell respectfully requests that this Court enter judgment against Royal Palm for compensatory damages in the amount of $275,000.00, pre judgment and post judgment interest together with the costs incurred by Fennell in connection with the prosecution of this litigation.

## COUNT II
### SECTION 10(B) AND RULE 10B-5

19. This Count of the Complaint is brought against Berry – Shino for the violation of Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5.

20. Fennell repeats and realleges Paragraphs 1 through 14 as if fully set forth herein.

21. The Royal Palm promissory note is a security as defined by Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5 promulgated pursuant thereto.

22. In convincing Fennell to forego any and all claims arising out of SSI-PM's failure to satisfy the note to Fennell and instead accept a substitute promissory note from Royal Palm, Defendant Benny - Shino made various misrepresentations including but not limited to:

> RPC is a much larger company than ACC [parent of SSI-PM]and owns interests in several other companies some of which are publicly traded. Since RPC is larger and more secure financially than ACC and RPC intends to go public within the next six months the Placement Agent [Berry – Shino] feels that it is a win/win situation for you;

> The Placement Agent recommends to you that instead of demanding a full refund with interest until paid off and receiving shares in SSI-PM that are probably going to be worth nothing in the foreseeable future, you instead

4

> take the deal as negotiated. The Placement Agent believes that RPC is considerably more stable and certainly much larger than Sunshine Industries or SSI-PM or ACC. This way you get your $275,000 back in February of 2006 (5 months) with 10% interest and we actually already have a certificate for 137,500 shares of Royal Palm Capital that they have sent to us assuming you would accept the deal.
> Bottom line if you accept their offer we believe you will get your $275,000 cash returned with 10% interest for one year plus the 137,500 shares of Royal Palm Capital stock.

See 9/7/2005 letter from Matt Shino to David Fennell, attached hereto as Exhibit B.

23. Benny – Shino failed to undertake any due diligence or investigation of Royal Palm before making the above misrepresentations and therefore made these representations knowingly or with reckless disregard for the truth and with the intent to deceive or defraud.

24. These misrepresentations concerned material facts regarding Royal Palm, an investment in Royal Palm, and Royal Palm's ability to satisfy an indebtedness.

25. As indicated, Benny - Shino made these misrepresentations by means of the mail and/or some other device or instrumentality of interstate commerce.

26. Fennell ultimately invested in Royal Palm in reliance upon Berry – Shino's misrepresentations.

27. As a result of his reliance on Berry-Shino's misrepresentations, Fennell has suffered monetary losses in excess of $275,000.00

**WHEREFORE**, Fennell respectfully requests that this Court enter a judgment against Berry-Shino for compensatory damages in excess of $275,000, prejudgment and post judgment interest, the costs incurred in connection with the prosecution of this action together with such further and other relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Berry-Shino hereby demands a trial by jury on all claims set forth herein.

Date: April 3, 2006

>Respectfully submitted,
>
>Feldman Gale, P.A.
>Counsel for Plaintiff
>Miami Center, 19th Floor
>201 South Biscayne Boulevard
>Miami, Florida 33131
>Phone: (305) 358-5001
>Fax: (305) 358-3309
>
>By: _____
>Steven E. Eisenberg / 441112
>E-Mail: SEisenberg@FeldmanGale.com

I:\fennell\pleadings\complaint.doc

6

**THIS NOTE AND THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR ANY APPLICABLE STATE SECURITIES LAWS. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

ROYAL PALM CAPITAL GROUP, INC.

PROMISSORY NOTE

Date: **July 15, 2005**                                     Amount: **$275,000**
                                                           West Palm Beach, Florida

    FOR VALUE RECEIVED, Royal Palm Capital Group, Inc., a Florida corporation ("Company"), promises to pay to the order of **David E. Fennell** ("Holder") the principal amount of **$275,000**, plus interest thereon at the rate of ten (10%) percent per annum, such principal amount and all accrued and unpaid interest to be due and payable on February 23, 2006.

    The following is a statement of the rights of Holder and the conditions to which this Note is subject, and to which Holder, by the acceptance of this Note, agrees:

    1. INTEREST.

    Interest will accrue on this Note beginning February 22, 2005, at the rate of ten percent (10%) per annum quarterly in arrears on the first day of April, July, October and a final interest payment at maturity on February 23, 2006 and will be due and payable on such date, computed from the date of issuance of this Note until payment of the principal amount of this Note has been made. Interest on the Note shall be computed on the basis of a 360-day year of twelve 30-day months.

    2. COMMON STOCK. Upon execution of this Note, the holder shall also be entitled to receive one share of unregistered, restricted common stock of the Company for each $2.00 in principal amount of this Note, specifically 137,500 shares.

    3. EVENTS OF DEFAULT. The occurrence of any of the following shall constitute an "EVENT OF DEFAULT" under this Note:

    (a) FAILURE TO PAY. Company shall fail to pay (i) when due any principal payment on the due date hereunder or (ii) any interest or other payment required under the terms of this Note



EXHIBIT A

on the date due and such payment shall not have been made within thirty (30) days of Company's receipt of Holder's written notice to Company of such failure to pay; or

(b) VOLUNTARY BANKRUPTCY OR INSOLVENCY PROCEEDINGS. Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated in full or in part, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing;

(c) INVOLUNTARY BANKRUPTCY OR INSOLVENCY PROCEEDINGS. Proceedings for the appointment of a receiver, trustee, liquidator or custodian of Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to Company or the debts thereof under any bankruptcy, insolvency or other similar law or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within thirty (30) days of commencement.

4. RIGHTS OF HOLDER UPON DEFAULT. Upon the occurrence or existence of any Event of Default and at any time thereafter during the continuance of such Event of Default, Holder may declare all outstanding obligations payable by Company hereunder to be immediately due and payable by written notice to the Company thereof, and such default is not remedied within thirty (30) days after receipt of such written notice. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Holder may exercise any other right, power or remedy granted to it or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

5. SUBORDINATION. The indebtedness evidenced by this Note is hereby expressly subordinated in right of payment to any present and future indebtedness of Company to banks, equipment lessors and other financial institutions.

6. SUCCESSORS AND ASSIGNS. Holder may not sell, transfer or otherwise dispose of the Securities except in accordance with the restrictions set out in the Purchase Agreement. The rights and obligations of Company and Holder of this Note shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

7. WAIVER AND AMENDMENT. Any provision of this Note may be amended, waived or modified upon the written consent of Company and Holder.

8. NOTICES. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given (i) upon receipt if personally


Original PPM

Ammendment



Fennel Letter
8-24-05


Shino Letter


delivered, (ii) three (3) days after being mailed by registered or certified mail, postage prepaid, or (iii) one day after being sent by recognized overnight courier or by facsimile, if to Holder, at c/o _____, or at such other address or number as Holder shall have furnished to Company in writing, or if to Company, at 625 North Flagler Drive, Suite 605, West Palm Beach, FL 33401, or such other address or number as Company shall have furnished to Holder in writing.

9. PAYMENT. Payment shall be made in lawful tender of the United States. This Note may be prepaid in whole or in part at any time by Company, without the prior written consent of Holder.

10. GOVERNING LAW. The descriptive headings of the several sections and paragraphs of this Note are inserted for convenience only and do not constitute a part of this Note. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the conflicts of law provisions of any other state

IN WITNESS WHEREOF, Company has caused this Note to be issued as of the date first written above.

ROYAL PALM CAPITAL GROUP, INC.

By: _____

Its: _____

3

## ADDENDUM TO THE PROMISSORY NOTE DATED JULY 15, 2005

This Addendum to the Promissory Note dated July 15, 2005 (the "Addendum") is entered into this 14th day of September, 2005 by and between Royal Palm Capital Group, Inc., a Florida corporation ("Company") and David E. Fennell ("Fennell") (collectively the "Parties").

**WHEREAS** the Company issued a Promissory Note in the principal amount of $275,000.00 in the name of David E. Fennell on July 15, 2005 ("Note");

**WHEREAS** it was intended that the Holder of the Note be the David E. Fennell Living Trust and not Fennell as an individual;

**WHEREAS** the Parties have agreed to amend the Note and intend that this Addendum shall constitute an amendment thereto;

**NOW, THEREFORE**, agreeing to be bound by the terms and conditions of this Addendum, the Parties hereby agree that the Note shall be modified and amended as follows:

1.  The name "David E. Fennell" as Holder of the Note shall be deleted in its entirety and replaced with the name "David E. Fennell Living Trust" as Holder of said Note

2.  The Parties agree that this Addendum amends the Note solely as amended hereby and that the Note shall remain in full force and effect and shall govern the relationship, duties, and rights of the Parties. All capitalized terms used in this Addendum, but not otherwise defined herein, shall have the meanings set forth in the Note.

3.  This Addendum sets forth the entire agreement and understanding of the Parties with respect to the subject matter hereof and shall supersede and cancel all prior offers, negotiations, and agreements between the parties that strictly relate to the matters contained herein. If a conflict arises between the terms and conditions of this Addendum and the Note, then such conflict shall be resolved in favor of this Addendum.

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Addendum on the date set forth above.

I hereby certify that I am authorized to execute this Addendum on behalf of the party for whom I am signing.

**ROYAL PALM CAPITAL GROUP, INC.**   **DAVID E. FENNELL**

By: _/s/ illegible_   By: _/s/ David E. Fennell_

Name: Gerald C. Parker
Title: Chairman



Berry Shino
SECURITIES
MEMBER NASD/SIPC

<u>Sent via Certified Mail Return Receipt Requested</u>

September 7, 2005

Mr. David Fennell
17859 N. 40th Street  Unit 101
Phoenix, AZ 85032-1760

RE:  SSI-PM Holdings, Inc.

Dear Mr. Fennell:

In response to your letter dated August 24, 2005, let me first say that we are very aware of the situation with your investment in SSI-PM Holdings, Inc., and have been hard at work behind the scenes attempting to make you whole on the transaction since we were notified that there were problems. In order for you to completely understand the situation first let me go through a chronological chain of events and what has been done to date. Hereinafter SSI-PM shall be referred to as, "the Company", Berry-Shino Securities, Inc. shall be referred to as, "Placement Agent", American Capital Corporation (Parent Corporation of SSI-PM) as "ACC", and Royal Palm Capital (Parent of ACC) as "RPC".

The Placement Agent and the Company signed an investment banking letter of intent which governs our relationship with SSI-PM on November 14, 2004. Among the various provisions of the Letter of Intent are the following:

> 6. <u>Undertaking to Give Notice of Events</u>
> Until the date of the last closing of the Private Placement or until the termination or expiration of this Agreement, whichever occurs first, the Company will notify the Placement Agent promptly of the occurrence of any event which might materially affect the Private Placement or the status of the Company.
>
> 8. <u>General Conditions.</u>
> (c) There will have been no materially adverse change in the business or financial condition of the Company, no materially adverse change in the overall capital markets in the United States, no declaration of a banking moratorium by the Federal Government or New York State, no outbreak of major hostilities or other national or international calamity, and no action by any government in respect of its monetary affairs which has a material adverse effect on any United States securities market.


EXHIBIT B

**CORPORATE OFFICE**
14500 N. Northsight Blvd. Ste. 101 • Scottsdale, Arizona 85260
Tel: 480.315.3660 • Fax: 480.556.6054 • Toll Free: 800.525.7945

**NEW YORK OFFICE**
45 Broadway / 9th Floor • New York, New York 10006
Tel: 212.344.1996 • Fax: 212.344.2383 • Toll Free: 800.870.9694

9. <u>Indemnification.</u>

Recognizing that transactions of the type contemplated by this engagement sometimes result in litigation and that the Placement Agent's role is limited to acting as the Company's agent, the Company agrees to indemnify the Placement Agent (and its directors, officers, agents, employees, and controlling persons) to the full extent lawful against any and all claims, losses and expenses (including all reasonable fees and disbursements of the Placement Agent and such person's counsel and the Placement Agent's and such person's reasonable travel and other out-of-pocket expenses reasonably and necessarily incurred in connection with the investigation of, and preparation for, any such pending or threatened claims and any litigation or other proceeding) arising out of any actions or omissions by the Company (and its directors, officers, agents, employees, and controlling persons) in connection with the actual or proposed transaction or the Placement Agent's engagement hereunder; provided, however, there shall be excluded from such indemnification: (a) any such claim, loss or expense that arises, to any material extent out of, or is based upon, any action or failure to act by the Placement Agent (and its directors, officers, agents, employees, and controlling persons), other than an action or failure to act undertaken upon the written consent of the Company; and (b) any action that is found in a final judicial determination (or a settlement tantamount thereto) to constitute willful misconduct, bad faith or negligence on the part of the Placement Agent.

The Placement Agent herein indemnifies the Company (and its directors, officers, agents, employees, and controlling persons), to the same extent set forth in the preceding paragraph, from any action or omission on the part of the Placement Agent in connection with any actual or proposed transaction or the Placement Agent's engagement hereunder.

The foregoing indemnification agreement shall be in addition to any rights that any indemnified party may have at common law.

After the signing of the letter of intent the Placement Agent then began a due diligence process which included a visit to the Company's corporate offices, old warehouse in Ohio, manufacturing facilities in IL and their new distribution facility in Olney, IL. The due diligence process included but was not limited to a background investigation of all corporate officers and directors of SSI-PM and its operating company Sunshine Industries. The Placement Agent also scrutinized all of the financial information regarding the company including the revolving line of credit carried by Wells Fargo Business Credit. In total there were approximately four three inch binders full of information required and reviewed by the Placement Agent. None of the information provided disclosed any, "problems" with the Company, or with the credit line carried by Wells Fargo Business Credit.

After the due diligence process was complete the private placement memorandum was prepared by the Company and was dated January 24, 2005. The offering was structured as a bridge loan for one year with interest of 10% payable quarterly and an equity kicker of one share of SSI-PM

2

for every $2 invested. There was originally a minimum offering of $500,000 to be closed on or before March 15, 2005 with the provision for an extension if necessary at the Company's discretion. There was an escrow account set up at Valley Commerce Bank which outlined the terms of the agreement and provided for a closing only after the minimum of $500,000 was reached. You signed the subscription agreements on January 27, 2005 and invested $275,000. On February 18, 2005 at the request of the Company you agreed to lower the Minimum Offering from $500,000 to $275,000 per the Second Amendment to the Confidential Private Placement Memorandum attached hereto as Exhibit A. This Memorandum included the following language:

> "We currently anticipate that we will use the proceeds form this Offering for working capital and other general corporate purposes including paying down accounts payable, adding inventory to fulfill sales (including new orders to Big Lots, Publix Grocery Stores, and Dollar General), and the acquisition of new businesses or other investments."

Furthermore, a new section was added to the PPM entitled "New Business Generated under the re-organization Plan" which discussed all of the new orders that the company had received and need money to fulfill orders. So it was based on the disclosed, 'good news" that you agreed to lower the minimum to $275,000 and again there was no disclosure of any problems with the Wells Fargo credit line.

A closing was held on February 22, 2005 and funds were disbursed to the Placement Agent as provided for in the PPM (commissions) and the balance was disbursed to the company. At that closing you were the only investor in the offering. During the time period from February 22 to March 11, 2005 there were multiple contacts with Mr. Boyce (Chairman of SSI-PM) and Mr. Frank Kinmonth, President of SSI-PM by the Placement Agent and not once was any "problem" identified by Mr. Boyce or Mr. Kinmonth. On March 12, 2005 prior to the initial deadline to close the private placement for the Company, the Placement Agent contacted Mr. John Boyce of SSI-PM to make arrangements to deposit additional funds into the escrow account for closing on March 15, 2005. John Boyce at that time informed the Placement Agent that there were some problems and that we should hold off depositing additional funds into the escrow account. Upon further inquiry it was disclosed by Mr. Boyce that Wells Fargo had called the line of credit and the Company had made other arrangements for a new line of credit and was in the process of implementing the new line. According to Mr. Boyce, Wells Fargo had gone into the Company's headquarters and distribution facility and illegally seized the Company's assets and terminated the employment of most all employees. He agreed to keep me informed as to further developments. None of this has ever been given to the Placement Agent in writing and only verbal notification has been given without a complete and through disclosure as to what actually happened to your investment. Approximately one week later, the Placement Agent was told that Sunshine Industries for all practical purposes had ceased doing business due to Well Fargo's illegally terminating all of the employees and taking possession of the warehouse in Olney, IL, and the corporate offices in Cleveland, OH. At that time the Placement Agent advised Royal Palm Capital Management as to the unsatisfactory nature of the situation, and insisted that Royal Palm Capital as the parent corporation, was responsible for rectifying the situation with you.

3

On March 23, 2005 R. Matthew Shino met with Ray Navarro, then acting as President of RPC and Dominic Bianco a V.P. of RPC here in Scottsdale. It so happens that RPC is raising money ($15,000,000) for themselves in an offering that involves a convertible note payable at 9% due in December of 2005 and convertible into RPC shares at $2.00 per share and RPC has the right to extend the note for an additional six months. These terms are much less favorable that the SSI-PM terms as the risk is less. We felt that if we could negotiate with RPC terms identical to the original SSI-PM bridge loan that you made that it would be advantageous to you. Over the next three months of hammering out details we were able to negotiate a 10% (1% higher that the Royal Palm Capital offering) note due on February 21, 2005 (one year from the closing of the original SSI-PM transaction), no extension provision and removal of the convertible feature and instead granting an equity kicker of one share of RPC for each $2 invested (the SSI-PM offering had the same equity kicker provision 137,500 shares). The equity kicker shares are free shares in the Company and paid as a bonus of sorts. We also got RPC to write a check for the first quarterly payment and they agreed to make quarterly payments of 10% until maturity in February of 2006. Therefore, essentially your investment and returns would be virtually identical to that originally made, however with a larger and much more stable company.

It was disclosed in the SSI-PM offering memorandum that in December 2004 ACC the parent of SSI-PM became a wholly owned subsidiary of RPC. RPC is a much larger company than ACC and owns interests in several other companies some of which are publicly traded. Since RPC is larger and more secure financially than ACC and RPC intends to go public within the next six months the Placement Agent feels that it is a win/win situation for you. At this point SSI-PM is for all intents and purposes gone and we have been told that it will probably go into bankruptcy. There is a potential for a legal victory over Well Fargo Bank but at the very least that is several years off in the future.

The Placement Agent recommends to you that instead of demanding a full refund with interest until paid off and receiving shares in SSI-PM that are probably going to be worth nothing in the foreseeable future, you instead take the deal as negotiated. The Placement Agent believes that RPC is considerably more stable and certainly much larger than Sunshine Industries or SSI-PM or ACC. This way you get your $275,000 back in February of 2006 (5 months) with 10% interest and we actually already have a certificate for 137,500 shares of Royal Palm Capital that they have sent to us assuming you would accept the deal. If for whatever reason RPC is not able to pay you off in February of 2006 then you have direct recourse to them instead of an indirect route through Sunshine Industries, SSI-PM or ACC to RPC and the multiple layers of corporations which may likely not share liability one to another. Other than a claim of fraud (which at this time is questionable) you might only have recourse to SSI-PM only and that could leave you with nothing.

At this point the Placement Agent has informed RPC that you have rejected the proposed settlement and have insisted that they return the $275,000 invested with 10% interest from the date of closing. We have not at this point returned the RPC note, interest check or the RPC stock certificate for 137,500 shares.

The bottom line is that we as the Placement Agent will do everything within our power to see that this situation is resolved to your advantage. If it is still your desire to get a refund of your $275,000 with 10% interest as stated in your letter, we have already been in contact with RPC to advise them of this, and are expecting a response from them shortly. In the RPC $15,000,000 offering the price of their stock has been set at $2.00 per share on the conversion. There is no guarantee that those 137,500 shares they have offered you are worth that but if they were that equals $275,000. Bottom line if you accept their offer we believe you will get your $275,000 cash returned with 10% interest for one year plus the 137,500 shares of Royal Palm Capital stock. If it is just a matter that you do not understand Royal Palm Capital and what they are we would be happy to sit down with you and explain the situation and could even set up a conference call to their corporate management. I have enclosed on of their brochures for your perusal. If you have any questions please feel free to contact me directly.

Sincerely,

R. Matthew Shino
President


Cc:   Mr. Danial de Sade

5

# CIVIL COVER SHEET

06 - 80307

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**

DAVID FENNELL,

**DEFENDANTS**

ROYAL PALM CAPITAL GROUP, INC., a Florida corporation and BERRY SHINO SECURITIES, INC., an Arizona corporation

MAGISTRATE JOHNSON

(b) County of Residence of First Listed Plaintiff **Maricopa County, Arizona**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Palm Beach County, Florida
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) Attorneys (Firm Name, Address, and Telephone Number)
Steven E. Eisenberg, Esq.
Feldman Gale, P.A.
201 South Biscayne Boulevard – Suite 1920
Miami, Florida 33131

Palm Beach cbw/ 80307 / Middlebrooks Johnson

Attorneys (If Known)

(d) Check County Where Action Arose: DADE, MONROE, BROWARD, **PALM BEACH**, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

(checkbox list: Contract, Torts, Forfeiture/Penalty, Bankruptcy, Other Statutes — "850 Securities/Commodities Exchange" marked)

## V. ORIGIN (Place an "X" in One Box Only)

[x] 1 Original Proceeding

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity)
Section 10(b) of the 1934 Securities Exchange Act and Rule 10B-5
This case arises out of the solicitation of Plaintiff in connection with a $275,000.00 investment and execution of a promissory note in the same amount.
LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 275,000.00

JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

JUDGE _____ DOCKET NUMBER: _____

DATE March **13**, 2006

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY
RECEIPT # 937873 AMOUNT $250.00 APPLYING IFP

{W:\Forms\other\M0239468 v 1, 6/17/2005 12:09 PM}

04/03/06